Hyman Smith and Lillian Smith v. Commissioner. Morris Smith and Esther Smith v. Commissioner.
Smith v. Commissioner
Docket Nos. 81089, 82666.
United States Tax Court
T.C. Memo 1962-294; 1962 Tax Ct. Memo LEXIS 14; 21 T.C.M. (CCH) 1563; T.C.M. (RIA) 62294; December 17, 1962
Martin N. Sussman, Esq., Milwaukee Western Bank Bldg., Milwaukee, Wis., and Sherman C. Peltin, Esq., for the petitioners *15 in Docket No. 81089. Herman M. Knoeller, Esq., for the petitioners in Docket No. 82666. Delman H. Eure, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in the income tax of petitioners for the years 1955, 1956, and 1957 in the following amounts: Docket
No.
Petitioner
Year
Deficiency
81089
Hyman and Lillian
Smith
1955
$ 5,010.05
1956
2,704.73
1957
36,673.44
82666
Morris and Esther
Smith
1955
3,715.68
1956
2,158.69
1957
14,790.76
Docket No. 81089 and Docket No. 82666 have been consolidated for opinion. The issues presented for decision are: (1) Whether and to what extent petitioners Morris and Hyman Smith were entitled to receive distributable partnership income for the period November 1, 1956, to and including July 12, 1957; and (2) Whether petitioner Morris Smith received taxable income in the amount of $7,930 in the nature of salary during the period November 1, 1956, to and including July 12, 1957. Additional issues presented by the pleadings have been disposed of by concession of the parties. Issue 1. Partnership *16 Dissolution Findings of Fact The stipulation of facts filed by the parties is incorporated herein as fact. Petitioners Hyman and Lillian Smith are husband and wife residing in Milwaukee, Wisconsin. They filed joint income tax returns for the calendar year 1957 with the director at Milwaukee, Wisconsin. Petitioners Morris and Esther Smith are husband and wife residing in Fox Point, Wisconsin. They filed joint income tax returns for the calendar year 1957 with the director at Milwaukee, Wisconsin. Petitioners Hyman and Morris Smith organized the Milwaukee Transformer Company, sometimes hereinafter referred to as "Transformer Co." or "company," as a partnership in which the petitioners were equal partners, on September 19, 1954. Transformer Co. was engaged in the manufacturing and sale of electrical equipment and its principal office and place of business were located at Milwaukee, Wisconsin. The partnership was formed by an oral agreement between Hyman and Morris in which they agreed that profits and losses were to be shared equally and that each was to contribute one-half of the capital. [1] Morris managed the manufacturing and delivery processes and Hyman managed the promotional *17 and financial phases of the company. Transformer Co. filed partnership returns of income for its fiscal year beginning November 1, 1954, and ending October 31, 1955, and for the fiscal year November 1, 1955, to October 31, 1956, with the director at Milwaukee, Wisconsin. Hyman and Morris each filed separate partnership returns of income on behalf of the company for the period beginning November 1, 1956, to and including July 12, 1957. During the fiscal years November 1, 1954, to October 31, 1955, and November 1, 1955 to October 31, 1956, under the direction of Hyman and Morris, a 50 percent allocation of distributable partnership net income was made to each partner on the partnership books of account pursuant to the original agreement. During the period beginning November 1, 1956, and ending July 12, 1957, the partnership's profit and loss statement prepared as of July 12, 1957, disclosed partnership income in the amount of $86,137.65. Transformer Co. maintained a checking account with the Home Savings Bank of Milwaukee and both Morris *18 and Hyman were authorized to draw checks on this account. All personal withdrawals by the partners were by check and charged to the "capital" or "capital withdrawal" account of the partners on the books of account of the company. Regular monthly financial statements had been issued by the company's auditors for the months of November and December of 1956 and January, February, and March of 1957, inclusive. These statements showed a net profit of $38,487.92 for the period November 1, 1956, to March 31, 1957. Morris never received any such statements during this period. In March 1957, the partners had a meeting concerning a possible dissolution of the partnership, and Morris offered to sell his entire interest to his brother for $125,000. Hyman rejected this offer on the basis that the partnership interest was worth substantially less. He sought to substantiate his position by certain representations to Morris to the effect that some of the accounts receivable were worthless, the inventory was obsolete, and the goodwill in the financial statements was overstated. Hyman subsequently made a counter-offer to purchase his brother's interest as of November 1, 1956, for $75,000 with the *19 stipulation that the purchase would be effective as of that date for tax purposes. Hyman offered to pay the income tax to be incurred by Morris on his distributive share of the partnership net income of Transformer Co. for the fiscal year November 1, 1956, to October 31, 1957, and he also agreed to assume any operating loss and other obligations of the company as of November 1, 1956. He flatly predicted that there would be a net loss from operations for the fiscal year November 1, 1956, to October 31, 1957. These negotiations ended in a bitter argument and Morris never returned to the company and did not pick up his weekly "withdrawal" checks until after July 12, 1957. However, he did make a "capital withdrawal" of $5,000 from the company's bank account on June 6, 1957. In May 1957, Morris received financial statements of Transformer Co. for the months of November and December of 1956 and January, February, and March of 1957. These statements showed a net profit of $38,487.92 to and including March 31, 1957, and total assets of $265,605.22 as of March 31, 1957, as well as the partners' capital account of $185,506.81. These were the only financial statements which were furnished to *20 Morris during the period November 1, 1956, to July 12, 1957, and although he and his attorneys made demands upon Hyman and his lawyers and auditors for financial statements and the books of original entry of Transformer Co., they received in addition only a copy of the partnership return of income filed for the fiscal period beginning November 1, 1956, and ending July 12, 1957. During the month of May 1957, the partners and their attorneys had approximately three meetings to discuss terms for a possible sale of Morris' partnership interest. The only information pertaining to the financial condition of the business of the company on which Morris had to rely was financial statements from November 1, 1956, to March 31, 1957, and the representations made by Hyman's counsel that these financial records did not truly represent the financial condition of the business. Hyman and his attorney repeatedly claimed that the goodwill of the company was virtually worthless, the merchandise inventory was obsolete, many accounts receivable were worthless, and that there very likely would be a net loss for the fiscal year of 1957. Because Hyman refused to turn the books of account and financial records *21 of Transformer Co. over to Morris and because he felt the cost of an audit was prohibitive, Morris and his counsel relied on the information furnished them. During May 1957, Hyman made several offers to Morris for the purchase of his share in the company ranging from $30,000 to $62,500. Hyman again represented he would pay the taxes for the fiscal period beginning November 1, 1956, and ending on the date of sale, and that the sale would be retroactive to November 1, 1956. Hyman's offers were rejected by Morris because they were substantially below the book value of his interest which was $92,753.40. Again in June 1957, Hyman, Morris, and their respective counsel discussed the proposed sale. Hyman and his counsel made some general representations concerning the financial condition of the business, among which was the fact that the company would sustain a substantial net loss from operations. However, they knew that the company was producing a sizable net profit in excess of $45,000 for the period November 1, 1956, to June 1, 1957. They again stated that the proposed transaction would relate back to the beginning of the fiscal year, November 1, 1956, and that Hyman would be responsible *22 for the taxes related to the transaction. On July 1, 1957, Morris brought suit in the Wisconsin Circuit Court for the County of Milwaukee to dissolve the partnership and requesting an accounting, alleging that the partnership had assets of approximately $250,000 and a net worth of about $200,000. Such allegations were based upon the financial statements furnished by Hyman. During the same month various offers and counter-offers were made by the parties for a possible purchase of Morris' interest and, on or about July 9, 1957, the parties entered into an oral agreement for the sale of his interest. On the basis of the representations made by Hyman's counsel as to the financial position of the company and the financial statements for the fiscal year ended October 31, 1956, and for the months of November and December 1956, and January, February, and March 1957, the parties agreed to the following terms: The purchase price was $70,000 to be fully paid within 60 days after the consummation of the contract. The sale was to be effective as of November 1, 1956, i.e., it was to be retroactive to November 1, 1956, and tax free to Morris; Morris, in turn, agreed to move for dismissal of the *23 partnership dissolution suit provided that the purchase price was paid within the 60-day period. On July 11, 1957, one of the attorneys representing Morris drafted a written contract for the sale of Morris' partnership interest to Hyman. The attorney was not present at the prior oral negotiations on or about July 9, 1957. He did not see the financial statements for the firm for November and December 1956 and January, February, and March of 1957, but did see the company's statements for the fiscal year ended October 31, 1956. He was not told by other counsel for Morris of the current financial condition but was told by Hyman's counsel that the company had sustained a loss for the period November 1, 1956, to July 10, 1957. The written agreement which was agreed to and signed by the petitioners on July 11, 1957, provided, in part: (1) That this is a full and final satisfaction, compromise and accord of any or all demands that each may have against the other resulting from their respective interests and operation of the partnership * * *
(3) That Hyman Smith for himself, his heirs, executors, administrators, and assigns agrees to pay to Morris Smith for the latter's interest *24 in the partnership * * * the sum of Seventy Thousand Dollars ($70,000.00), of which Five Thousand Dollars ($5,000.00) has heretofore been paid, and upon the signing of this agreement the sum of Fifteen Thousand Dollars ($15,000.00) shall be paid, and the balance of Fifty Thousand Dollars ($50,000.00) is to be paid to Morris Smith on or before September 10, 1957. That in event payment is not made on or before September 10, 1957, this agreement shall be null and void and that the sum of Twenty Thousand Dollars ($20,000.00) paid * * * shall be applied upon any sum that may be due said Morris Smith by reason of his having a one-half (1/2) interest in the partnership * * * (4) That all partnership withdrawal checks through July 10, 1957, are to be forthwith delivered to Morris Smith. (5) [That Hyman Smith is to assume the partnership's obligations under certain losses.] * * *
(6) * * * Hyman Smith, agrees and assumes to pay any and all obligations of the partnership which have been incurred as of consummation of this agreement * * * [and] agrees to hold the said Morris Smith * * * harmless from any claims of any persons resulting from any obligations * * * of the partnership. *25 (7) [Upon payment of the $50,000 installment by September 10, 1957, the case by Morris Smith for partnership dissolution and accounting shall be dismissed.] Immediately upon execution of the agreement for the sale of Morris' partnership interest, Hyman took over complete control of the company. Suppliers were notified as they were seen by Hyman and, beginning on July 13, 1957, the business was operated by him as sole proprietor. Hyman filed an affidavit with the company's bank to the effect that he was sole owner of the company and he alone was authorized to draw money on the company account. He also filed a statement with the bank authorizing it to charge checks drawn by the partnership prior to July 12, 1957, against the account of Milwaukee Transformer Company, sole proprietorship. After the agreement was performed by each party, Hyman filed a partnership tax return for the period ended July 12, 1957. [2] During May 1958, Morris filed a separate, amended partnership return of income for the same period. The return filed by Hyman was prepared from the books and records and reported income as follows: *26 Income from operations
$86,137.65
Partners' shares: Hyman Smith
$43,068.83
Morris Smith
43,068.82
$86,137.65
Morris upon receiving a copy of the above return prepared and filed an amended return based in part upon information taken from Hyman's return and in part upon his understanding of the agreement entered into on or about July 9, 1957. Morris did not have access to the books of the company. The return filed by Morris reported income as follows: Income from operation for fiscal
period November 1, 1956 to July
12, 1957
$86,137.65
Partner's shares: Hyman Smith
$78,207.65
Morris Smith
7,930.00
$86,137.65
Petitioner Hyman reported $43,068.83 as his distributive share of partnership net income in the joint income tax return filed by him and his wife for 1957. Petitioner Morris reported $7,930 as his distributive share of partnership net income in the joint income tax return filed by him and his wife for 1957. The respondent, in the notice of deficiency issued to petitioners Hyman and Lillian, determined that the entire distributable net income of the Transformer Co. for the fiscal period November 1, 1956, to July 12, 1957, in *27 the amount of $92,853.26 [3] was taxable to them for 1957. In the notice of deficiency issued to petitioners Morris and Esther, the respondent determined that approximately one-half of the distributable net income of the Transformer Co. for the same period ended July 12, 1957, or $44,072.71, [4] was taxable to them for 1957. Opinion The main issue which we must determine is whether petitioners Morris and Hyman Smith at a time prior to or contemporaneous with the sale of an entire partnership interest by one to the other orally agreed to *28 modify the original agreement regarding their respective distributive shares of the net profit of the company. The respondent contends, in the alternative, that either Hyman is taxable on 100 percent of partnership net profit for the fiscal period November 1, 1956, to and including July 12, 1957, or that Morris and Hyman are each taxable on 50 percent of the net profit of the company for that period. Petitioner Hyman contends that the written contract of sale executed by the partners should control although it is silent as to allocation of profits and that any other extrinsic evidence prior to or contemporaneous with the execution of the written contract should be excluded from our consideration in determining the proper allocation of net profit. Thus Hyman seeks to invoke the parol evidence rule as a basis for excluding such extrinsic evidence of an oral contract. He contends that he is taxable on only one-half of the distributable net income of Transformer Co. for the period November 1, 1956, to July 12, 1957, or $43,068.83. Petitioner Morris claims that the original oral agreement as to the distributive shares of partnership profit was orally modified by the partners at the *29 time they entered into an oral contract for the sale of his partnership interest and that the agreement readjusting their respective shares of profit should be considered together with the written contract as forming a single contract. He contends that he is not taxable on any of the distributable net income of Transformer Co. for the period November 1, 1956, to July 12, 1957. Under section 702(a) [5] of the Internal Revenue Code of 1954, a partner is required to include his share of the partnership income in his reportable taxable income in determining his income tax. Section 704(a) [6] provides that a partner's distributive share of income, gain, or loss shall be determined by the partnership agreement. Under section 761(c) [7] a partnership agreement as to allocation of net profits includes any modification thereof provided such modification takes place at or before the time prescribed for filing the partnership return. The effect of such a modification is that it relates back to the beginning of the fiscal or calendar year in which the modification occurs. Thus it is established that the partners may adjust between themselves their interest in earnings in *30 any proportion agreed upon and are taxable accordingly. Hellman v. United States, 70 Ct. Cl. 498, 44 F. 2d 83 (1930); Raymond R. Goodlatte, 4 B.T.A. 165 (1926). Therefore, it is incumbent upon petitioner Morris to prove the existence of a modifying agreement. Hyman contends that the only evidence admissible to prove such *31 modification is the written agreement and that any extrinsic oral agreement must be excluded under the parol evidence rule. We, however, have admitted such extrinsic evidence to establish a prior or contemporaneous oral agreement as to the allocation of profits. That such evidence was admissible for this purpose is well established as a matter of law. Stern v. Commissioner, 137 F. 2d 43, 46 (C.A. 2, 1943); Scofield v. Greer, 185 F. 2d 551 (C.A. 5, 1950); 9 Wigmore, Evidence § 2446 (3d ed. 1940) and 1962 Supp. The fundamental question here is whether the written contract effective as of July 12, 1957, accurately presents the true substance of the agreement between the parties to it or whether there was, in addition, an effective oral modification of the original agreement respecting the distributive share of profit. Leff v. Commissioner, 235 F. 2d 439 (C.A. 2, 1956). We do not think that Hyman and Morris intended the written contract to be exclusively dispositive of the question of profit allocation as between themselves. The record establishes the existence of an oral agreement entered into by the parties which, in effect, modified the original *32 oral partnership agreement and provided that all of the partnership net profit earned during the fiscal period beginning November 1, 1956, and ending July 12, 1957, was to belong to Hyman. During the first negotiations in which proposals were made for the purchase of Morris' interest in the partnership, during March 1957, Hyman made offers to the effect that he would assume all taxes and obligations. Hyman and his counsel made certain representations as to the financial condition of the company which, in essence, were that the company would not make a profit for the year and that because the inventories, receivables, and goodwill had declined in value, the actual worth of Morris' interest in the partnership was substantially less than its book value. On the basis of these representations Morris and his counsel did not believe there would be a partnership profit for the fiscal period but that there would be an operating loss which would be absorbed by Hyman and that such loss was reflected in the lower offer. This assumption of the operating loss by Hyman, however, correspondingly meant that he would derive the benefit of any net profit from the operations of the business if there *33 were any. Thus, Hyman's contention was that the offer to purchase included an adjustment of the original oral profitsharing agreement and that pursuant to such adjustment he would be deemed to own 100 percent of Transformer Co.'s capital account and current profits or loss as of November 1, 1956. The parties again met during May and June of 1957 and conducted a series of meetings to discuss the proposed sale. Hyman again made representations as to the declining value of the partnership net worth and the possible operating loss for the fiscal year and made offers ranging from $30,000 to $62,500. The book value of Morris' interest as of November 1, 1956, was more than $90,000. However, Hyman again stated that Morris' interest would be purchased as of October 31, 1956, that if there were any losses from operations he would absorb them and, by implication, if there were profits resulting from operations, they also would belong to him. He also declared that Morris would not have to worry about taxes because he (Hyman) would "take care of them." By July 9, with the parties close to agreement, they met and agreed to a sales price of $70,000 in cash payable over a 60-day period. The same *34 representations were made regarding financial condition and Hyman reaffirmed his position as to his payment of all of the taxes with the added agreement that he would purchase the capital account of Morris as of October 31, 1956, and that he would assume the operating losses for the fiscal year and, inferentially, that he would receive any profit earned during the fiscal period from November 1, 1956, to the date of sale. At this point the parties entered into a binding contract whereby Morris agreed to sell and Hyman agreed to purchase the interest of Morris at a settled price under certain terms and conditions. Hyman agreed to purchase Morris' interest effective as of October 31, 1956; that all the distributive net profit of the company would belong to Hyman and also that Hyman would assume any losses, including those due to operations, for the period November 1, 1956, to and including July 12, 1957. Hyman's conduct from March through July of 1957 indicates that his real motive was to become the sole owner of the company's net profit for the period November 1, 1956, to July 12, 1957. By withholding the books of account and financial statements of the company from Morris and by *35 declaring that the financial condition of the company was weak and that there would be a net loss from operations for the fiscal period, he was able to convince Morris that such a loss was probable. Having convinced Morris of the probability of a net loss, he agreed to assume such loss as a condition of sale knowing that the company would have a sizable net profit and that he alone would own it without having compensated Morris for it. This whole line of conduct by Hyman confirms the existence of an oral agreement whereby Hyman's distributive share of the company's net profit was to be 100 percent for the fiscal period ended July 12, 1957. The fact that the parties executed a written agreement which was silent as to the allocation of partnership profit did not destroy the legal effect of the oral agreement since the written instrument formed only a part of the complete agreement which was, we find, both oral and written. Our decision, however, is not to be interpreted to mean that there was an effective revision of the partnership profit-sharing agreement as of March 1957, and it is not the holding of the Court that the partnership was terminated during the oral negotiations, which *36 factually distinguishes this case from Ray H. Schulz, 34 T.C. 235, affd. 294 F. 2d 52 (C.A. 9, 1961). Within the meaning of section 708(b) [8] of the 1954 Code, we are convinced that the partnership continued to exist until the sale was consummated by the agreement to sell the interest and reallocate profits. Under section 761 of the Code, however, such reallocation has the effect of relating back to the beginning of the fiscal year. Our decision in this case is supported by Leff v. Commissioner, supra. In that case, members of a partnership entered into negotiations for a sale by taxpayers of their interest to the remaining partners. These negotiations were held between August and October 31, 1948, and *37 it was orally agreed that the sale would be deemed to take place as of October 14, 1948, and that the "selling partners" would not have any current net profit allocated to them after that date although the actual sale and dissolution of the partnership was in January 1949 when the partners executed a written agreement to that effect. The fiscal year end of the partnership was January 31, 1949, and on a partnership return for that period, it showed the reallocation of net profit to the remaining partners. The Court of Appeals held that there was a binding agreement reached which resulted in a change in the interests of the taxpayers in the profits for the entire fiscal year ended January 31, 1949. Although petitioner Hyman relies on Estate of William Goldstein, 29 T.C. 931 (1958), to substantiate his view, that case is distinguishable from the case before us in that the written agreement there was itself intended to resolve all the rights of the parties as to their respective shares of net profit including the allocation thereof. Accordingly, Hyman is, in our opinion, the owner of the entire net profit of $86,137.65 and must include that amount in his income for 1957. *38 Issue 2. Partnership Withdrawal Findings of Fact During the period November 1, 1956, to July 12, 1957, 41 weekly checks totaling $7,930 were drawn by the company to the order of Morris Smith. During that same period, checks for the same total amount were drawn to the order of Hyman Smith. Each of these checks was designated on the attached voucher and on the books of the company as capital withdrawals. All checks payable to Morris which were dated subsequent to March 1957 were held by Hyman and delivered to Morris sometime after July 12, 1957. On June 6, 1957, Morris made a capital withdrawal from the company's bank account in the sum of $5,000 because of the withholding of his regular weekly capital withdrawal checks. During their final negotiations for the sale of Morris' partnership interest on July 9, 1957, the parties agreed that the $5,000 withdrawal would be treated as a part payment of the purchase price by Hyman. During the calendar years 1955, 1956, and 1957, petitioners in their joint income tax returns reported as income from Transformer Co. their distributive shares of the net profit of the company. However, their joint income tax returns disclose that they received *39 modest compensation (other than distributive partnership net income) from the company during each of those years. Petitioners Morris and Esther, on their joint income tax returns for 1955, 1956, and 1957, reported $1,850, $3,050, and $1,350, respectively, as compensation received from Transformer Co. Petitioners Hyman and Lillian, on their joint income tax returns for 1955, 1956, and 1957, reported $1,850, $3,050, and $3,900, respectively, as compensation received from the company. The books of account, financial statements of the company, and joint income tax returns of the petitioners Morris and Hyman disclose that the amounts which they reported as their distributive shares of net profit from the company in their joint income tax returns were the same amounts which were credited to their respective capital accounts on the company's books. Their respective withdrawals during the year were then charged against the same accounts. Although petitioners Morris and Esther reported as income the withdrawals totaling $7,930 on their joint income tax return for 1957, and paid tax thereon, they now claim that this amount was erroneously reported on their return for that year. The *40 respondent made no change in petitioners' treatment of this item on their 1957 return. Petitioners made an overpayment of income tax attributable to the erroneous inclusion of $7,930 on their return for 1957. Opinion Petitioner Morris contends that $7,930 of partnership withdrawals which he made from November 1, 1956, to July 12, 1957, were nontaxable withdrawals of partnership capital and are neither compensation for services rendered to the firm nor withdrawals of current partnership net profit which has not been taxed. He contends he mistakenly included that amount in his income for the year 1957 and claims an overpayment of the tax paid on such sum. We hold that petitioner Morris is correct in his contention. An examination of the books and records of the firm, and the partnership and joint income tax returns of the petitioners for 1955, 1956, and 1957 discloses that the partners, pursuant to section 702 of the Code, [9] reported as income in those returns their distributive shares of the firm's net profits as opposed to reporting, as income, periodic wages as payment for services rendered [10] to the business. *41 The amounts so reported as distributive shares of partnership income by the petitioners on their joint returns for 1955 and 1956 were credited at the end of the fiscal year to their "capital" accounts on the books of the company, and each withdrawal, including the 41 checks totaling $7,930 here in issue, was then charged against this account. The "capital" or "capital withdrawal" account thus represented amounts of net income which had been fully taxed in prior years or taxed in full in this year to Hyman. We therefore hold that the withdrawals of $7,930 during the year 1957 represent nontaxable withdrawals of capital funds and that petitioners made an overpayment of income tax for 1957 attributable to the inclusion of this amount. Decisions will be entered under Rule 50. Footnotes
1. The record is silent as to the amount of time each partner was to devote to the business and as to the division of assets upon dissolution.↩
2. The record does not disclose the date of the filing of this return.↩
3. This amount represents "corrected partnership ordinary income" determined by the respondent in his notice of deficiency by disallowing the deductions in the amount of $6,715.61 and adding that amount to the ordinary income in the amount of $86,137.65 shown on the partnership return of income of Milwaukee Transformer Co. filed by Hyman.↩
4. The respondent determined that $44,072.71 represents Morris' and Esther's share of the distributable income of the partnership for the period ended July 12, 1957. That this amount is less than one-half of the "corrected ordinary partnership net income" of $92,853.26 is unexplained by the record.↩
5. SEC. 702. INCOME AND CREDITS OF PARTNER. (a) General Rule. - In determining his income tax, each partner shall take into account separately his distributive share of the partnership's - * * *
(9) taxable income or loss * * * (a) Effect of Partnership Agreement. - A partner's distributive share of income, gain, loss, deduction, or credit shall * * * be determined by the partnership agreement. ↩
6. SEC. 704. PARTNER'S DISTRIBUTIVE SHARE. ↩
7. SEC. 761. TERMS DEFINED. * * *
(c) Partnership Agreement. - For purposes of this subchapter, a partnership agreement includes any modifications of the partnership agreement made prior to, or at, the time prescribed by law for the filing of the partnership return for the taxable year * * * which are adopted in such other manner as may be provided by the partnership agreement.↩
8. SEC. 708. CONTINUATION OF PARTNERSHIP. * * *
(b) Termination. - (1) General Rule. - * * * a partnership shall be considered as terminated only if - (A) no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, or (B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits.↩
9. According to section 702↩ of the 1954 Code, a partner's income includes his distributive share of partnership income. 10. The joint returns of the petitioners for 1955, 1956, and 1957 show that they received a minimal salary not exceeding $3,900 during each such year in addition to their distributive shares of partnership income. These amounts are so substantially different from that in question as to [*] any finding that the $7,930 was part of Morris Smith's salary. For the year 1957, each partner did, in fact, report as salary, apart from his distributive share of income, amounts not in excess of $3,900.↩